J-A27038-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANDRE THOMAS | : | |
| | : | |
| Appellant | : | No. 2276 EDA 2019 |

Appeal from the Judgment of Sentence Entered February 26, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0009354-2017

BEFORE:   STABILE, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                **FILED FEBRUARY 9, 2021**

Appellant, Andre Thomas, appeals from the judgment of sentence imposed following his convictions of murder of the first degree, attempted murder, aggravated assault, robbery, burglary, conspiracy, carrying a firearm without a license, and possession of an instrument of crime.[1]  We affirm.

The trial court summarized the factual background of this case as follows:

> Shortly before midnight on August 21, 2016, Hakeem Rahman was home, with his wife, Shaquana Caldwell, and six children at 3730 North 7th Street in the city and county of Philadelphia. Hakeem, Shaquana, and [Rahman's] twelve-year-old [son] were in the bedroom.  When Shaquana opened the bedroom door she found [] two armed men coming up the stairs inside her house. Ms. Caldwell tried to slam the bedroom door, but [Appellant]

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a), 901(a), 2702(a), 3701(a)(1)(i), 3502(a)(1), 903, 6106(a)(1), and 907(a), respectively.

managed to get the barrel of his shotgun in the opening. Hakeem told his wife to open the door and let them in. Appellant ran through the open door, hit Shaquana in the head with the gun, and demanded money from Hakeem. It was evident Mr. Rahman knew his assailant, calling him "Dre." In response [Appellant] told Hakeem not to say his name. Hakeem said the name "Dre" two more times. Rahman only had fifteen hundred dollars to turn over to [A]ppellant, who became enraged at the paltry sum, shooting Hakeem with the shotgun, striking his chest and injuring his diaphragm, liver, colon and stomach. Shaquana was then shot twice, once in the face and one in the arm. [Appellant] then stood over Hakeem and shot again, this time striking Hakeem's ribs, stomach, spleen, pancreas, lungs, heart and aorta. Mr. Rahman did not survive those two shotgun blasts. [Rahman's] twelve-year-old [son] was able to call 911. Officers responded and determined that the two assailants entered through the rear of the house, putting a chair to the back window and climbing through. While making their escape, the assailants hid the shotgun behind a broken door in the alley, and left a utility bag with a box of ammunition and a hair cover in the alleyway. Video was obtained from the neighborhood, and the cell phone of the decedent investigated, retrieving the recent contacts and communications. [Appellant] was identified in a photo array by Shaquana as the individual who shot her and her husband in the morning hours of August 22, 2016.

Trial Court Opinion, 11/12/19, at 3-4 (transcript citations omitted).

Appellant was arrested and charged on September 12, 2017, and he proceeded to a jury trial in February 2019. On February 26, 2019, the jury returned a guilty verdict on the above-stated charges. That same day, the trial court sentenced Appellant to an aggregate sentence of life imprisonment without the possibility of parole.[2] Appellant filed a post-sentence motion

---

[2] Appellant received a sentence of life imprisonment without the possibility of parole for the murder offense, consecutive terms of imprisonment of 10 to 20 years for each of the attempted murder, robbery, burglary, and conspiracy charges, and consecutive terms of imprisonment of 2 years and 6 months to 5 years for the firearms and possession of an instrument of crime convictions.

- 2 -

challenging the verdict, which was denied by operation of law on July 8, 2019.

Appellant thereafter filed this timely appeal.

Appellant presents the following issues on appeal:

I. Whether the trial court erred in overruling defense counsel's objection to the prosecutor's closing argument wherein she committed gross misconduct by intentionally misrepresenting the DNA evidence depriving Appellant of a fair and impartial trial.

II. Whether the Commonwealth violated **Brady** when it failed to turn over information regarding a potential second suspect, Andrew "Dre" Davis, who matched the description of one of the assailants.

III. Whether the evidence for First Degree Murder, Attempted Murder, and all offenses for which Appellant was convicted is insufficient to sustain the verdict of guilt where the Commonwealth failed to prove identity beyond a reasonable doubt.

IV. Whether the verdict for First Degree Murder, Attempted Murder, and all offenses for which Appellant was convicted is against the weight of the evidence as the evidence tending to show identification is so unreliable the verdict could only be based on conjecture, surmise, and emotion.

Appellant's Brief at 6 (trial court disposition omitted).

Appellant first challenges the prosecutor's description of the testimony of the Commonwealth's DNA expert during her closing argument. Our Supreme Court has explained the applicable legal standards as follows:

To succeed on such a claim, [a defendant is] required to demonstrate that the prosecutor's comments violated a constitutionally or statutorily protected right, such as the Fifth Amendment privilege against compulsory self-incrimination or the Sixth Amendment right to a fair trial, or a constitutional interest such as due process. To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. The

touchstone is the fairness of the trial, not the culpability of the prosecutor.

A prosecutor may make fair comment on the admitted evidence and may provide fair rebuttal to defense arguments. . . . Any challenge to a prosecutor's comment must be evaluated in the context in which the comment was made.

Not every unwise, intemperate, or improper remark made by a prosecutor mandates the grant of a new trial. Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict.

While it is improper for a prosecutor to offer any personal opinion as to the guilt of the defendant or the credibility of the witnesses, it is entirely proper for the prosecutor to summarize the evidence presented, to offer reasonable deductions and inferences from the evidence, and to argue that the evidence establishes the defendant's guilt. . . . The prosecutor must be free to present his or her arguments with logical force and vigor, and comments representing mere oratorical flair are not objectionable.

*Commonwealth v. Burno*, 94 A.3d 956, 974 (Pa. 2014) (internal citations, quotation marks, and brackets omitted).

At trial, Philadelphia Police Department forensic scientist Lynn Haimowitz described her analysis of six DNA samples taken from items found in the alley behind the victims' house: a utility bag, a hair bonnet or "do rag," the shotgun determined to have been fired at Rahman and Caldwell, and live and spent shotgun shells. N.T., 2/22/19, at 101-06. Testing showed that Appellant was not a match for the DNA taken from the sample of the live shotgun shells, and one of the two swabs of the shotgun was determined to not contain enough DNA for testing. *Id.* at 104-06. For the remaining four samples – from the zipper and handle of the utility bag, the sweatband of the

hair bonnet, the spent shotgun shells, and the second swab of the shotgun –
DNA from one or more individuals was present, at least one of whom was
male, and testing was inconclusive as to whether Appellant's DNA matched
the DNA of the male individual in the samples. *Id.* at 103-05. Haimowitz
explained in her testimony that an inconclusive result means that there were
insufficient DNA types, or alleles, present in the samples to determine whether
the person to whom the sample is being compared is a match, but also that
that person cannot be excluded. *Id.* at 102-04, 107-09.

During her closing argument, the prosecutor displayed a chart from
Haimowitz's expert report that compared the alleles detected in Appellant's
DNA with those of the six swabbed samples. *See* Commonwealth Ex. 88. The
prosecutor stated:

> So essentially, we have the bag swab. This bad boy swabbed
> (indicating). And then we also have the hair bonnet, the cover,
> the do-rag. And then the box of the shotgun shells. This was also
> printed. Nothing could come back. The box is excluded.
> [Haimowitz] tells you that in her report. She can say that
> [Appellant] is excluded as a source of the DNA detected in the
> sample and that's the one that ends in 5-1. And that is a swab of
> the 13 live 12-guage shotgun shells taken from inside that utility
> bag. She can say from this alone, it's not him. It is not him. And
> she said that to a reasonable degree of scientific certainty. Now,
> what she did is she showed you this graph, which is not all
> inclusive, but this was the chart that she used to explain her
> findings. And she explained to you that across the top are the
> sample numbers. Those are the numbers that are assigned to
> each of the things that were swabbed, but also the defendant.
> And remember, she told you, this one here. This last one. That's
> the defendant. So as we look down this row on the right, as we
> look down this row, we see what alleles the defendant has at each
> of these locations. That's what she told you. And she compared
> it to all the other samples. Now the one in the middle ending in

4-9, she said that they weren't []able to get enough DNA. So she had no conclusion here. The one ending here in 5-1, she's able to say not him, not there. But with all the other samples she says inconclusive. She told you, "I can't say that he was not there. I can't say he's there." **Which is pretty remarkable when on the last sample, 5-1, she is able to say, [n]ot him, not there.** And why is she able to say inconclusive? Because if you look at all the alleles he has at each of those locations and then you compare it to the alleles on each of the samples, he wasn't there. Say excluded. **It's a whole lot of circles. While all she could say is inconclusive. It's certainly not the same word as excluded. You weigh that evidence, you weigh those circles, you weigh this. Those alleles at the same location from each of those samples, you weigh that and you look at it as, again, one more arrow pointing in the direction of the defendant saying, yeah, Shaquana, you got it right.**

N.T., 2/25/19, at 198-200 (emphasis added). Appellant preserved his appellate issue by objecting at the conclusion of the closing argument, which the trial court overruled. *Id.* at 205-06.

Appellant argues that the trial court erred when it overruled his objection to the closing "because it was a complete mischaracterization and misrepresentation of the DNA expert's testimony." Appellant's Brief at 27. Appellant maintains that Haimowitz did not testify that it was possible to infer that Appellant's DNA matched the swabbed samples simply because some of the alleles were matching, but instead only that Appellant was not a conclusive match to the swabbed items. Appellant also claims that the prosecutor committed misconduct by altering the chart from the expert report comparing Appellant's DNA to the six samples by adding red circles around the matching alleles that were not present when it had been previously shown to the jury.

- 6 -

Appellant argues that he suffered prejudice because the jury was misled to think that it could interpret DNA as a partial match based on single alleles in common between samples and he was particularly prejudiced in light of the weakness of Caldwell's testimony identifying him as her attacker. Appellant asserts that the prosecutor compounded the mischaracterization of the evidence by improperly appealing to the jury's emotions by stating that the matching alleles were "one more arrow pointing in the direction of the defendant saying, yeah, Shaquana [Caldwell], you got it right." N.T., 2/25/19, at 200. Appellant contends that the trial court could have ameliorated the harm done by giving a curative instruction to the jury, advising that the challenged statement was unsupported and that they should ignore the mischaracterization of the evidence.

In rejecting Appellant's argument, the trial court concluded that the Commonwealth summarized the DNA evidence and drew reasonable inferences therefrom "well within acceptable norms." Trial Court Opinion, 11/12/19, at 15. The trial court determined that, viewing the closing arguments in their totality, the prosecutor's remarks could not have prejudiced the jury such that it would not have rendered a true verdict. *Id.* at 15-16. Furthermore, the trial court noted that it properly instructed the jury that the arguments of counsel were not evidence and the jury was exclusively responsible for determining the facts and weighing the evidence. *Id.* at 14-16.

We agree with the trial court that the prosecutor did not commit misconduct in her closing statement. During her direct testimony, Haimowitz discussed the process of comparing DNA from evidence samples to reference samples of an individual that was visually represented in the chart from her expert report:

> [W]hat we're looking at is basically a visual representation of both the alleles that are detected, as they are in this table, as well as a better representation of where information might be missing. But we're looking at, could the alleles that were detected for these question samples have come from this certain individual? Is there no way they could have come from this certain individual? Is it possible but we can't tell for sure?
>
> But we're comparing alleles from one sample, to alleles from another sample.

N.T., 2/22/19, at 108-09. Haimowitz then described the specific matching alleles between Appellant's DNA and the four samples with inconclusive results:

> Q. . . . So in this sample for this location, 15 and 16 **indicated over here at the laser pointer**, are those the alleles the defendant has at this location at D 3 S 1358?
>
> A. Yes.
>
> Q. And then for each sample, are these the alleles detected, so for the first sample, and the next, and the next, at that same location?
>
> A. Yes. Within the table across the row is the same location for each sample that was tested.
>
> Q. So in this case, in four of the samples we also see allele number 16; is that correct?
>
> A. Yes.

*Id.* at 109-10 (emphasis added).

The prosecutor accurately summarized Haimowitz's testimony, explaining that Appellant's DNA was not found on two of the six samples based on a lack of sufficient DNA on one of the shotgun swabs and a non-match from the swab of the live shotgun shells. **Compare** N.T., 2/22/19, at 104-06 **with** N.T., 2/25/19, at 198-99. The prosecutor also accurately stated that for the remaining four samples the results were inconclusive, echoing Haimowitz's statement that an inconclusive result means that Appellant's DNA might be on the sample but also might not be. **Compare** N.T., 2/22/19, at 112 ("Inconclusive is just that. For one reason or another, we just can't tell. The individual might be on the sample, they may not.") **with** N.T., 2/25/19, at 199 ("But with all the other samples she says inconclusive. She told you, 'I can't say that he was not there. I can't say he's there.'").

To the extent Appellant contends that the prosecutor overemphasized the fact that the DNA evidence did not exclude him, this was drawn directly from Haimowitz's testimony and further was a fair rebuttal to defense counsel's closing statement urging the jury to place no weight on the DNA evidence as it does not have "anything to do with anything that's going on in this case." N.T., 2/25/19, at 157. We also find the prosecutor's statement that the DNA evidence was "one more arrow pointing in the direction of the defendant saying, yeah, Shaquana, you got it right" to be a reasonable response to defense counsel repeatedly calling into question Caldwell's identification of Appellant as being at the scene of the crime. *Id.* at 152-55, 169, 200.

As she had done during Haimowitz's direct testimony, the prosecutor in her closing statement compared specific matching alleles in Appellant's DNA with those of the four inconclusive samples. *Compare* N.T., 2/22/19, at 108-10 *with* N.T., 2/25/19, at 199. While Appellant argues on appeal that this was an inaccurate representation of the DNA evidence, he tellingly did not challenge Haimowitz on her testimony about the matching alleles during cross examination. Furthermore, while Appellant challenges the use of red circles surrounding matching alleles on the chart from Haimowitz's expert report that was shown to the jury during closing, he fails to explain how the circles are distinguished from the unobjected-to use of a laser pointer to circle the matching alleles during Haimowitz's testimony. *See* N.T., 2/22/19, at 107-09.

In any event, the trial court addressed any concern regarding the prosecutor's potential misrepresentation of the evidence through its instruction both before trial and before and after the closing statements. N.T., 2/21/19, at 31-32; N.T., 2/25/19, at 143; N.T., 2/26/19, Vol. I, at 37-39. The trial court instructed the jury that:

> When counsel makes their closing arguments, what they typically do is review the evidence with you and ask you to draw certain inferences from that evidence. That can be very helpful in evaluating a case. I do need you to keep in mind, however, that you are not bound by counsel's recollection of the evidence, nor are you bound by counsel's perspective of what the evidence in the case shows. It is your recollection of the evidence and your recollection alone, which must guide you in your deliberations in this case.

N.T., 2/25/19, at 143. The trial court further emphasized that the jury was "the sole judges of the facts and the credibility and the weight of the evidence" and it was "not required to accept the arguments of either lawyer." N.T., 2/21/19, at 31; N.T., 2/26/19, Vol. I, at 38.

In sum, we conclude that the challenged portion of the Commonwealth's closing argument does not warrant reversal of the verdict because it did not form a "fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict." *Burno*, 94 A.3d at 974 (citation omitted). Appellant's first appellate issue thus merits no relief.

Appellant next argues that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn over a photograph of an early suspect in the case, Andrew Davis. In *Brady*, the United States Supreme Court held that the prosecution's failure to produce evidence material to the guilt or punishment of the accused is a violation of the due process clause of the Fourteenth Amendment. *Id.* at 87-91. As our Supreme Court has explained, *Brady* "imposes upon a prosecutor the obligation to disclose all favorable evidence that is material to the guilt or punishment of an accused, even in the absence of a specific request by the accused." *Commonwealth v. Bagnall*, 235 A.3d 1075, 1085 (Pa. 2020). To establish a violation of *Brady*, "a defendant has the burden to prove that: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the prosecution has suppressed the evidence, either willfully or inadvertently; and (3) the evidence was material,

meaning that prejudice must have ensued." *Id.* at 1086. "[N]o **Brady** violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence." *Id.* at 1091 (citation omitted).

Andrew Davis came to the attention of the police when they visited Caldwell in the hospital after the shooting and she provided them with a piece of paper that had been in Rahman's wallet; the paper listed various phone numbers that Rahman had once written down while in the process of switching phones. N.T., 2/21/19, at 105-07. On the paper, the name "Dre" was listed followed by a phone number. *Id.* at 108. Detective William Kelhower of the Philadelphia Police Department testified that he obtained the subscriber information for that phone number and determined that the number belonged to Andrew Davis, who Detective Kelhower learned from Caldwell was a childhood friend of Rahman's living in West Philadelphia. N.T., 2/25/19, at 23-24.

Appellant argues that the Commonwealth violated **Brady** by not turning over a photo of Davis, which Appellant posits the Commonwealth would have had in its possession based upon the fact that Davis had a criminal record from several controlled substances convictions. Appellant asserts that the photo would have shown that Davis matched Caldwell's initial description of her assailant as a black man in his late thirties, with a medium build, and approximately 5'8" tall, the description that Caldwell initially provided of her assailant. N.T., 2/21/19, at 109. Appellant bases the assertion that Davis

matched Caldwell's description on a full-body photo of Davis that Appellant obtained through social media after trial, and which he attached to his post-sentence motion. Appellant's Brief at 34; Consolidated Motion and Memorandum of Law for Reconsideration and Extraordinary Relief, 3/5/19, Exhibit. Appellant argues that he was prejudiced by the purported *Brady* violation because photos of Davis – who matched Caldwell's description, was involved in the drug trade, and was known as Dre – would have led the jury to conclude that Davis was the assailant in this case, not Appellant.

We are unpersuaded by Appellant's claim of a *Brady* violation in this case. Initially, Appellant acknowledges that the Commonwealth turned over in discovery a copy of the paper listing Davis's phone number, the search warrant for that number, and the cell phone records obtained through that warrant. While Appellant asserts "[u]pon information and belief" that the Commonwealth only provided Davis's criminal extract on "the morning of jury selection," Appellant's Brief at 33 n.6, the record is devoid of any evidence that the Commonwealth produced the extract at this late juncture and Appellant's "information and belief" would not have been sufficient to meet his burden to prove a *Brady* claim as to the extract. *Bagnall*, 235 A.3d at 1085.

Appellant also failed to show that the Commonwealth was in possession of a photo of Davis that was exculpatory or otherwise favorable to his defense. "*Brady* does not require the disclosure of information 'that is not exculpatory but might merely form the groundwork for possible arguments or defenses,' nor does *Brady* require the prosecution to disclose 'every fruitless lead'

considered during a criminal investigation." ***Commonwealth v. Roney***, 79 A.3d 595, 608 (Pa. 2013) (citation omitted). Even assuming that the Commonwealth was in possession of a photo of Davis, which is not a part of the record in this case, it is not at all apparent that a police photo would have showed a similarity to Caldwell's description of the shooter, such as by showing his build, height, or facial hair. It is only Davis's full body social media photo obtained post-trial that Appellant avers as having a sufficient resemblance to Caldwell's description of her assailant. The Commonwealth was not charged under ***Brady*** with disclosing information or materials that "might merely [have] form[ed] the groundwork for [Appellant's] possible arguments or defenses." ***Id.*** (citation omitted); ***see also Commonwealth v. Paddy***, 15 A.3d 431, 451 (Pa. 2011) (holding that police reports related to boyfriend of victim, which the defendant claimed "would have alerted trial counsel to the existence of an alternative theory as to who killed [the victim] and why" were not ***Brady*** material solely because they might form the groundwork for a potential defense). As Appellant has not demonstrated that the Commonwealth withheld favorable evidence, he is not entitled to relief on his ***Brady*** claim.

In his third and fourth appellate issues, Appellant challenges the sufficiency and weight of the evidence with respect to the evidence that identified him as Rahman's and Caldwell's assailant. The evidence at trial related to the identification of Appellant as the perpetrator of the assault was as follows. Three days after the shooting, while still in the hospital, Caldwell

- 14 -

described the shooter to police as a black man in his late thirties, with a medium build, and approximately 5'8" tall. N.T., 2/21/19, at 109. Caldwell identified the accomplice who remained just outside the bedroom as a black man in his 30s, weighing approximately 250 pounds, and standing approximately 5'6" or 5'7" tall. *Id.* at 110. Caldwell also told officers that Rahman had argued on the phone about his drug-dealing business with an individual named Dre two days prior to his murder. *Id.* at 79-83, 86.

On August 15, 2017, new detectives assigned to the case asked Caldwell to participate in a double-blind photo array.[3] *Id.* at 88; N.T., 2/25/19, at 4-11. According to the detective who conducted the photo array, Caldwell did not initially identify anyone on her first look through the photos, but had a noticeable reaction when she saw Appellant in photo number three. N.T., 2/21/19, at 89; N.T., 2/25/19, at 8-11. Caldwell then asked to see number three again, at which point she became emotional and stated that she was sure that Appellant was the man who caused her to live in fear since Rahman's murder. N.T., 2/21/19, at 89-90; N.T., 2/25/19, at 9-11.

In her interview with detectives after the photo array, Caldwell initially stated that the individual who she identified in photo number three was the accomplice to the shooter who remained outside the bedroom; however later in the interview she clarified that she was previously mistaken and that the

---

[3] In a double-blind photo array, the officer conducting the identification is not assigned to the case and has no knowledge of the incident or which individual in the array is a suspect in the case. N.T., 2/25/19, at 5-6, 33-34.

individual in photo number three was the one who shot her and Rahman. N.T., 2/21/19, at 92-94. Caldwell also informed detectives during the interview that Rahman had gone to a McDonald's at North Broad Street and West Hunting Park Avenue in Philadelphia on the evening of his murder and was upset when he returned home. *Id.* at 96; N.T., 2/25/19, at 16. In October 2017, Caldwell was asked to identify Appellant in an in-person lineup, but she was unable to do so. N.T., 2/21/19, at 118-19, 174-80. Rahman's 12-year old son also viewed the same double-blind photo array as Caldwell and was unable make an identification, although he confirmed to police that Rahman referred to his assailant as Dre. N.T., 2/22/19, at 125, 128; N.T., 2/25/19, at 34-35.

During her trial testimony, Caldwell again identified Appellant as the individual who Rahman addressed several times as Dre and who fired the shotgun that struck her and Rahman. N.T., 2/21/19, at 64-73. Caldwell also identified Appellant as one of two men visible in exterior security footage taken from a neighbor's home; in the video, the two men entered a narrow alleyway behind her home shortly before the time of the shooting. *Id.* at 90-91; N.T., 2/22/19, at 143-47. Caldwell testified that she was able to identify Appellant in the video because he walked with a limp as he had in her home. N.T., 2/21/19, at 91. Caldwell further explained to the jury that, when she initially said that Appellant was not the shooter during her August 15, 2017 interview with police, she had confused the shooter and the accomplice in her mind because of nervousness. *Id.* at 93-94. Caldwell was examined at trial

regarding her preliminary hearing testimony when she was asked to "look around the courtroom" and identify her assailant and she stated only that Appellant "appears to look like the gentleman that was in my home" and "[a]ppears to be Dre." *Id.* at 117. Caldwell reiterated that she was "100 percent" sure, both at the preliminary hearing and at trial, that Appellant was the individual who entered her home and shot her and Rahman. *Id.* at 118.

Two other witnesses testified that they recognized Appellant as having a connection to Rahman. Jonita Boone, who was dating Rahman at the time of his death, testified that she had seen Rahman meet Appellant twice at the same McDonald's on North Broad Street that Caldwell had referenced Rahman visiting on the day of his murder. *Id.* at 128-34. Boone participated in a lineup, and she identified Appellant as the Dre that Rahman had met at McDonald's.[4] N.T., 2/21/19, at 142-43, 179-85. Sade Purnell, who had previously been in a relationship with Rahman and who shared a child with him, testified that she had seen Rahman meet with Appellant on two occasions in the few months prior to his death: the first time at a gas station next to the McDonald's on North Broad Street and a second time outside a North Philadelphia residence when the two had a conversation and Rahman handed Appellant a small package. *Id.* at 153-57. Purnell was also with Rahman the

_____

[4] Notably, while Caldwell was unable to identify Appellant and Boone did identify Appellant at separate lineups, the officer who conducted the lineups testified that Appellant had a different appearance at the two lineups, with his beard only of a salt-and-pepper appearance at the first, but at the second lineup it was fully gray. N.T., 2/21/19, at 183.

day before he died; Rahman had three heated phone conversations while they were together, and Purnell heard Rahman say during one of the calls "I ain't f--king with Dre no more." *Id.* at 158-61.

The trial court instructed the jury as follows with respect to its evaluation of eyewitness identification testimony:

> Now there's a question of whether some of th[e witnesses'] identifications are accurate. A victim or other witness can sometimes make a mistake when trying to identify a criminal. If certain factors are present, the accuracy of the identification testimony is so doubtful that the jury must receive it with caution. Identification testimony must be received with caution if the witness, because of bad decision, poor lighting, or other reasons, did not have a good opportunity to observe the criminal; if the witness, in their testimony, is not positive as to identity; if the witness's testimony as to identity is weakened by qualification, hedging, or inconsistencies in the rest of their testimony; by their not identifying the defendant, or by identifying someone else as a criminal before the trial.
>
> If you believe that one or more of those factors are present, then you must consider with caution the witness's testimony identifying a defendant as a person who committed the crime. If, however, you do not believe at least one of those factors is present, then you need not receive the testimony with caution. You may treat it like any other testimony. You should consider all evidence relevant to the question of who committed the crime, any evidence of facts and circumstances from which identity or non-identity of the criminal may be inferred. You cannot find the defendant guilty unless you're satisfied beyond a reasonable doubt by all the evidence, direct and circumstantial, not only a crime was committed, but it was the defendant who committed it.

N.T., 2/26/19, Vol. I, at 12-13.

Appellant argues that the evidence was insufficient to find him guilty beyond a reasonable doubt of each of the charged crimes based on Caldwell's wavering identification of him during the preliminary hearing, her failure to

identify him at a lineup, and her initial failure to select Appellant from a photo identification. Appellant asserts that he did not match Caldwell's description of the shooter provided to police shortly after the incident, but that if anything he was closer to her description of the accomplice. According to Appellant, the lack of a sufficient identification evidence undermines the reliability of the guilty verdict because of the lack of other evidence pointing to him as the perpetrator, including inconclusive DNA evidence from the crime scene and no reliable forensic evidence indicating that Appellant and Rahman had previously been in contact.[5]

The Commonwealth argues in response that Appellant is in essence challenging the weight of the evidence identifying him as the individual who shot Rahman and Caldwell, rather than the sufficiency of the identification evidence. We agree. As our Supreme Court has explained, the distinction

_____

[5] Appellant also asserts that Caldwell's description was contradicted by that of Rahman's 12-year old son, who told police immediately after the incident of the shooter being approximately 5'7" or 5'8", of a skinny build, and wearing all black clothing. Appellant's Brief at 39. The boy did not testify at trial, Appellant did not provide a citation to the portion of the trial record where this description was reported, and we have failed to locate the boy's description in our review of the record. Therefore, we will not address his argument based on this claim. *See* Pa.R.A.P. 2119(c) (if reference is made to evidence of record, "the argument [section of an appellate brief] must set forth . . . a reference to the place in the record where the matter referred to appears"); *Commonwealth v. Mulholland*, 702 A.2d 1027, 1034 n.5 (Pa. 1997) ("In a record containing thousands of pages, this court will not search every page to substantiate a party's incomplete argument."); *Commonwealth v. Brown*, 200 A.3d 986, 991 (Pa. Super. 2018) (appellant's failure to properly develop argument with citations to relevant portions of record results in waiver of claim).

between a claim challenging the sufficiency of the evidence and a claim challenging weight of the evidence is "critical":

> A claim challenging the sufficiency of the evidence, if granted, would preclude retrial under the double jeopardy provisions of the Fifth Amendment to the United States Constitution, and Article I, Section 10 of the Pennsylvania Constitution, whereas a claim challenging the weight of the evidence if granted would permit a second trial.
>
> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.
>
> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

***Commonwealth v. Widmer***, 744 A.2d 745, 751-52 (Pa. 2000) (internal

citations, quotation marks, and footnote omitted).

With respect to sufficiency of the evidence challenges relating to identification issues, the "general rule [is] that any uncertainty in an eyewitness's identification of a defendant is a question of the weight of the evidence, not its sufficiency." *Commonwealth v. Cain*, 906 A.2d 1242, 1245 (Pa. Super. 2006) (citation omitted); *see also Commonwealth v. Valentine*, 101 A.3d 801, 806 (Pa. Super. 2014). "Evidence of identification need not be positive and certain to sustain a conviction." *Commonwealth v. Edwards*, 229 A.3d 298, 306 (Pa. Super. 2020), appeal granted on other grounds, 237 A.3d 978 (Pa. 2020) (citation omitted).

> Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. Out-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh.

*Id.* (citation omitted).

In this appeal, Appellant acknowledges Caldwell's in-court identification of him as the assailant, but asks us to balance this positive identification against other evidence, including her initial description of the assailant to police and her failures to conclusively identify him at earlier stages of the case. Notwithstanding the framing of the argument, this argument is, in effect, a weight of the evidence, not a sufficiency of the evidence, challenge. *See Commonwealth v. Miller*, 172 A.3d 632, 643 (Pa. Super. 2017) ("[A] true weight of the evidence challenge concedes that sufficient evidence exists to

sustain the verdict but questions which evidence is to be believed."). Appellant also implicitly seeks that we reassess the credibility of Caldwell's in-court identification of Appellant, which is beyond our purview in the context of a sufficiency of the evidence challenge. *Commonwealth v. Moyer*, 171 A.3d 849, 852 (Pa. Super. 2017); *Commonwealth v. Wilson*, 825 A.2d 710, 713-14 (Pa. Super. 2003).

Nevertheless, to the extent Appellant validly asserts a sufficiency claim with respect to the identification evidence, his claim lacks merit. Caldwell unequivocally testified at trial that Appellant was the man who shot her and Rahman. Caldwell also confirmed to the jury that she had identified Appellant as her assailant during the preliminary hearing and in the double-blind photo array. The testimony of the detective who conducted the photo identification supports that Caldwell selected Appellant's photo without prompting. Caldwell likewise viewed security footage taken shortly before the murders in the vicinity of her home and identified Appellant in that footage.

Caldwell's identification of Appellant was corroborated by other evidence at trial, including the fact that Caldwell and Rahman's son reported to police immediately after the shooting that Rahman referred to his killer as Dre, which is Appellant's nickname. Detective William Kelhower testified that he subpoenaed records from two of the cell phones that Rahman used and learned that Rahman had exchanged texts with a phone registered to Demetrius Jackson in the two weeks in which Rahman accused Jackson of being a "slime ball," having "disrespected" Rahman, and stated "[w]hen I see

you, it's beef, just know that." N.T., 2/25/19, at 19-27; *see also* Commonwealth Ex. 69. Detective Kelhower later discovered that Appellant was Jackson's nephew's step-father and Appellant showed up as also being a resident on a public record report of Jackson's home address. N.T., 2/25/19, at 21-22, 29-31. Finally, two other witnesses testified at trial that they saw Appellant and Rahman together in the months preceding the murder at a location Rahman had visited on the evening he was killed, and one of those witnesses testified that she heard Rahman say on the telephone "I ain't f--king with Dre no more" the day before his murder. N.T., 2/21/19, at 161. Viewed in the light most favorable to the Commonwealth, this evidence was clearly sufficient evidence at trial to identify Appellant as the perpetrator of the crimes of which he was convicted.

Turning to Appellant's weight of the evidence challenge, our "appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Rosser*, 135 A.3d 1077, 1090 (Pa. Super. 2016) (*en banc*) (citation omitted). When the trial court finds that the verdict is not against the weight of the evidence, "we must give the gravest consideration to the trial court's conclusion because it is the trial court, and not the appellate court, that 'had the opportunity to see and hear the evidence presented.'" *Commonwealth v. Cramer*, 195 A.3d 594, 601 (Pa. Super. 2018) (citation omitted). "[A] defendant will only prevail on a challenge to the weight of the evidence when the evidence is 'so tenuous,

vague and uncertain that the verdict shocks the conscience of the court.'" ***Id.*** (citation omitted).

Appellant argues that the verdict was against the weight of the evidence based upon "weak and inconclusive identification testimony." Appellant's Brief at 41. In particular, Appellant focuses on the "highly suspect circumstances" relating to the August 2017 photo array identification in which Caldwell first responded in the negative when viewing photograph number 3 – Appellant – and she only claimed that Appellant was her attacker after a second review of the photos. ***Id.*** Appellant also highlights Caldwell's videotaped interview that was conducted directly after the photo array and played for the jury, in which Caldwell initially told detectives that the individual she saw in photograph number 3 was not the individual who shot her, but rather his accomplice who remained outside the bedroom. It was only upon resuming the interview following a short break when Caldwell and both detectives left the room that Caldwell stated that Appellant was her attacker.

Appellant further argues that his identity as the perpetrator of the attack was cast into doubt by Caldwell's description provided to officers in the immediate aftermath of the incident of the attacker as several inches taller and at least a decade and a half younger than Appellant. Appellant additionally cites Caldwell's preliminary hearing testimony, in which she testified that Appellant only "appears" to be her assailant rather than that he in fact was her assailant. N.T., 2/21/19, at 117. While Appellant acknowledges that Caldwell's identification of him was definite at trial, he

contends that the previous unreliable and inconsistent identifications nevertheless render the jury's verdict unreliable.

In addressing Appellant's weight of the evidence challenge, the trial court concluded that, after its thorough review of the record, "the verdict was not so contrary to the evidence as to shock one's sense of justice, nor was it so tenuous, vague and uncertain that it shocks the conscience of the court." Trial Court Opinion, 11/12/19, at 12. "To the contrary," the court continued, "the evidence in this case was compelling and substantial, and strongly supported the verdict." *Id.* Therefore, the trial court found the weight of the evidence claim to be without merit. *Id.*

Upon review, we do not discern an abuse of discretion by the trial court in rejecting Appellant's weight of the evidence claim. Appellant essentially requests that we reassess the credibility of Caldwell's testimony identifying him as the perpetrator of the attack on her and Rahman. However, we cannot do so as resolving issues related to credibility and conflicting evidence were matters solely entrusted to the jury as the trier of fact. *Cramer*, 195 A.3d at 600. That is particularly true here where the trial court properly instructed the jury that they must treat with caution the testimony identifying Appellant as the individual who committed the charged criminal acts if that testimony demonstrated any indicia of unreliability. N.T., 2/26/19, Vol. I, at 12-13; *see Commonwealth v. Johnson*, 139 A.3d 1257, 1280 (Pa. 2016) (describing the necessary elements of a jury instruction as to the reliability of eyewitness

identification testimony, commonly known as a **Kloiber** instruction, **Commonwealth v. Kloiber**, 106 A.2d 820 (Pa. 1954)).

In any event, we agree with the trial court that Caldwell's testimony was not "so tenuous, vague and uncertain that the verdict shocks the conscience." **Cramer**, 195 A.3d at 601 (citation omitted). Regarding the double blind photo array identification, both Caldwell and the detective who showed Caldwell the photos testified that she looked through all of the photos once, then asked to look at Appellant's photo a second time, at which point she told the detective she was "100 percent sure" that Appellant was her attacker. N.T., 2/21/19, at 89-90; **see also** N.T., 2/25/19, at 8-11. Rather than seemingly being conducted under "highly suspect circumstances," as Appellant contends, Appellant's Brief at 41, the jury could have merely interpreted Caldwell as taking her time during the photo identification to ensure that she did not hastily identify the wrong individual.

Furthermore, while she initially told detectives during a subsequent interview that Appellant was the individual who remained on the stairs outside the bedroom, Caldwell explained to the jury that she was "nervous" to speak about the incident and at first "mixed up" the shooter and the accomplice. N.T., 2/21/19, at 92-94. Caldwell testified that she quickly realized her mistake during a break in the interview and clarified to the detectives when the interview resumed that Appellant was in fact the shooter and not the accomplice. **Id.** at 93. In any event, the video of the interview was played

at trial, allowing the jury the opportunity to assess her credibility. *Id.* at 94; Commonwealth Ex. 101.

In addition, any uncertainty in Caldwell's identification of Appellant prior to trial must be balanced against Caldwell's conclusive statements at trial that Appellant was the perpetrator of the attack. Caldwell definitively testified that Appellant was the individual who entered her home and shot her and Rahman. N.T., 2/21/19, at 64-73, 118. Caldwell also explained to the jury that she was equally certain that Appellant was the shooter when she was asked to identify him at the preliminary hearing. *Id.* at 117-18. Furthermore, Caldwell viewed the security video taken outside her home and testified that Appellant was visible in the footage based on his limp, which she also observed when he was inside her house. *Id.* at 90-91. In light of the certain trial identification, and the other corroborating evidence such as the contemporaneous reports that Rahman addressed his killer using Appellant's nickname of Dre and the testimony of two witnesses that Appellant and Rahman had business dealings in the months prior to his death, we are not persuaded that the jury's reliance on Caldwell's identification to convict Appellant shocks the conscience.

Because Appellant has failed to establish the trial court abused its discretion in denying his weight of the evidence claim, his final appellate argument merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>2/09/2021</u>